### DILL et al. v. SUPREME LODGE, KNIGHTS OF HONOR.

(District Court, E. D. Missouri, E. D.    September 10, 1915.)

#### No. 4444.

1. CREDITORS' SUIT ☞1—"CREDITORS' BILL"—NATURE OF.

A "creditors' bill" is simply an effort on the part of the judgment creditors, unable to collect their debts through the medium of the law, to reach equitable interests of the debtor, and so a bill by members of a fraternal insurance association to have a receiver appointed is not a creditors' bill.

[Ed. Note.—For other cases, see Creditors' Suit, Cent. Dig. §§ 1, 2; Dec. Dig. ☞1.

For other definitions, see Words and Phrases, First and Second Series, Creditors' Bill.]

2. INSURANCE ☞708—FRATERNAL INSURERS—NATURE OF.

An incorporated association, composed of members upon whom assessments were made for the purpose of paying death benefits for deceased members, not conducted for profit, is in the nature of a trust, and a court of equity has jurisdiction to protect the trust fund.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1845; Dec. Dig. ☞708.]

3. INSURANCE ☞708—APPOINTMENT OF RECEIVER—FRATERNAL INSURANCE COM-
PANIES.

An incorporated fraternal insurer, which was simply an aggregation of
individuals upon whom assessments were imposed to collect death bene-
fits, lost its young members, so that the average age was 55, and the mem-
bership decreased to a point where, at the original rates, assessments had
become insufficient to pay the claims. It appeared .that, if the assess-
ments were raised to the necessary figure, the younger members would
withdraw. *Held* that, in such case, the court would appoint a receiver
to take over the assets of the company and hold them for those interested,
paying only the matured claims, and in case of rehabilitation the prop-
erty would be turned back to the association.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1845; Dec. Dig.
☞708.]

4. INSURANCE ☞708—APPOINTMENT OF RECEIVER—FRATERNAL INSURANCE
COMPANIES—OBJECTION.

Though the state of Missouri, in which a fraternal insurer was incor-
porated, reserved the right to appoint a receiver when such company
should be in a condition that there would be a strong likelihood of inabil-
ity to carry out the object for which it was organized, the insurer can-
not, where the state, speaking through its Attorney General, disavowed
an intention to appoint a receiver, object to the appointment by the fed-
eral courts.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1845; Dec. Dig.
☞708.]

5. INSURANCE ☞708—FRATERNAL INSURERS—EXPENSES.

Where the officers of a fraternal insurer called a meeting, pursuant to
the direction of the court, to form a plan for rehabilitation, expenses
incurred for such meeting are properly allowed.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1845; Dec.
Dig. ☞708.]

6. INSURANCE ☞708—FRATERNAL INSURANCE—SALARIES.

Where the court directed that salaries of officers of a fraternal insurer
should be reduced to living wages, it is improper to continue to pay the
same salaries that were paid when it was in a flourishing condition.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1845; Dec.
Dig. ☞708.]

In Equity. Bill by W. A. Dill and others against the Supreme
Lodge, Knights of Honor, a corporation. Receiver appointed.

Max Ruler and Horace L. Dyer, both of St. Louis, Mo., for plain-
tiffs.

F. H. Bacon, R. P. Williams, and C. B. Williams, all of St. Louis,
Mo., for respondent.

Before TRIEBER and DYER, District Judges.

TRIEBER, District Judge (orally). In the case of Dill et al. v. Su-
preme Lodge of the Knights of Honor we have given the matter the
most careful consideration, realizing fully the importance of the case.
Thousands of men, women, and children are interested in the result of
this case. Perhaps in a large majority of the cases the insurance obtain-
ed in this lodge is probably the only provision they have made for the
protection of their wives and children after death. The able argu-
ments made by counsel have aided us considerably in reaching our
conclusions. We have carefully examined the numerous authorities,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which the diligence of counsel has submitted to us, and given them such force and effect as we have thought they are entitled to. There were quite a number of questions argued to the court, all of which have received careful consideration.

[1] In determining this matter we should take into consideration, first, the nature of this bill. It is not strictly a creditors' bill, nor is it a bill for the purpose of winding up an insolvent corporation. A creditors' bill is simply an effort on the part of judgment creditors, who have exhausted all the remedies which the law affords them, and, being unable to collect their debts, to apply to a court of equity for the purpose of reaching the equitable interests of the judgment debtor. Usually it is for the purpose of reaching some property which has been fraudulently conveyed by the debtor, and, the legal title being in other parties, of course it is impossible in an action at law to reach them. This is not such a bill, nor is it a bill to wind up a manufacturing or mercantile corporation which has become insolvent.

[2] While it is true that this is a corporation, yet it is not a business corporation, nor a corporation for the purpose of doing business for a profit. It is simply an aggregation of individuals to create a fund in order to enable the parties to make provision for their wives, children, or their heirs in case of death. There is no profit in it; assessments are made for the purpose of paying death benefits; no one receives any profits; no investments are made; there is no capital. We might properly call it a charity in the nature of a trust fund to provide in the case of death for the survivors of the deceased members.

That courts of equity have jurisdiction in all cases of trust is elementary. In a case of this nature the question of creditor is practically immaterial, because the parties who are members may suffer just as great an injury by the dissolution of a corporation of this nature, while they are alive, as those who have departed this life. It is true that, upon the winding up of a corporation like this, those whose claims have matured would be preferred to those still living. Still there is a contingent interest possessed by every member which may become vested at any time by reason of the death of the member.

[3, 4] It has been the public policy of every state in the Union— in fact, we might say, of every civilized government—to try and protect the members of such organizations by preventing the corporation, fraternal society of this nature, from carrying on its business whenever proof establishes beyond question, as it does in this case, that it would be impossible for the corporation to carry out the objects of its existence and induce its members to continue paying assessments, especially when they are increased periodically, which would be perpetrating a fraud on them.

In this case the evidence shows beyond question that this Supreme Lodge is unable to continue its business for any length of time. If the assessments are raised to an extent which would be necessary in order to provide for all the members thereof, when the average age has reached as high as it has in this case, the rates would be correspondingly high, with the result that, either owing to poverty, inability to

pay, or fear that the assessments would be raised continually, and just about the time the man dies, the institution would be unable to pay. This would naturally cause a great many members to withdraw, and the worst of it is that the withdrawal of members in cases of this nature is generally of those members who are most valuable to the institution by reason of their good health and age. If the average age of its members, as has been stated here, now exceeds 55, it will in less than a year exceed 60, because all younger members in perfect health will try to withdraw, because they will find the assessments are too great and uncertain. The decrease of membership has been so continuous for the last 15 or 20 years that for the court to presume for a moment that there can be an increase of new members, an infusion of young blood, is preposterous.

Now it has been said that under the laws of the state of Missouri the courts are absolutely prohibited from appointing a receiver in matters of this kind; that the state has reserved to itself the sole right to appoint a receiver whenever it is found that the condition of the institution is such that there is a strong likelihood that it will be unable to carry out the object for which it was organized. Assuming, without deciding, that this contention would be correct, there is only one party that can object to it, and that is the state itself. This corporation, if it is in the hopeless condition this lodge seems to be in, has no such right. In this case it appears that the state of Missouri, acting through the Attorney General, not only has declined to take any proceedings for the purpose of winding up the concern and protecting the rights of the members thereof, but the Attorney General in open court has stated that as far as the state is concerned it has no objection to the corporation being wound up in this court. That being the case, the corporation has no right to object, because the provision of the law was not made for the benefit of the corporation; it was made for the benefit of the creditors of this association, the state acting as the trustee or guardian for them. So that disposes of this point.

It is unnecessary to review the testimony, because it clearly appears that, not only is this concern unable to carry out its contracts, but it is practically impossible to rehabilitate it. Judge Pollock, sitting in this court when the first application for a receiver was made, very properly, we think, gave them an opportunity to rehabilitate. What has been the result? The assets to-day are less in proportion to the liabilities than they were then; the parties who have just claims will get less than they would have gotten if a receiver had been appointed at the time the application was made. There is not the least likelihood that the conditions can possibly improve, unless there can be such rehabilitation by a large addition to the membership; the new members being offered inducements to join, so as to increase the membership by bringing in a sufficient number of young people, and thus reduce the average age. We believe, if there is a possibility to do that, it can be done just as well after the appointment of a receiver as before such appointment. If at any time after the receiver is appointed (the only money that can be paid out by the receiver will be for the death claims that have matured; the others cannot get anything until these claims are

paid) this lodge can rehabilitate itself, perfect a plan of rehabilitation which will appear to the court to be feasible, the court can immediately discharge the receiver and turn the assets in the hands of the receiver back to the parties.

It is a matter of everyday occurrence where large corporations are placed in the hands of receivers for the sole purpose of reorganization. We believe, in the majority of cases in which receivers have been appointed for large railroad systems, it was done for the purpose of reorganization, and when that purpose was accomplished the property was generally turned back to them. When they could not reorganize by reason of the nonconsent of all the parties, there had to be a sale, and the purchase was usually made for the owners of the property for the purpose of reorganization. So in this case, if at any time the lodge can rehabilitate itself and satisfy the court that it is in such condition that it can carry out the objects of the order and provide safely for the protection of all of its members, I am authorized to say that the court will unhesitatingly turn the property back and throw no obstacle in the way of reorganization; but as conditions now are we feel that to permit this institution to go on would simply result in the waste of assets, and be a detriment, not only to the members who are still living, but to the widows, orphans, and beneficiaries of those who have died, or are likely to die, while the order is under the control of the officers.

[5] The court also desires to say that some of the charges of mismanagement since the application for the appointment of a receiver are without foundation. The expenses of a meeting of the Supreme Lodge for the purpose of devising a plan of rehabilitation were proper; in fact, it was by order of this court that it met, and those persons who attended that meeting should be paid their expenses. This court is informed that under the laws of the order these expenses are entirely proper.

[6] It is perfectly plain that the salaries which were paid when the order was in flourishing condition were continued in spite of the order that living wages only should be paid, and that is perhaps a subject of just criticism. When an order loses its membership to the extent that this order has lost it, when instead of 45,000 or 50,000 members it has only a membership of 9,000, 10,000, or 15,000, it is not right that the same salaries should be paid when the membership is so much smaller. When the order was made that only living wages should be paid, it was an abuse of the order of the court to continue to pay the large salaries that were paid; but those amounts are comparatively small. Other than this, I do not know that there has been any waste. To pay the stenographers the pitiful wages which they received, $75 to $80, we do not consider this more than a living wage, and this court, if it had charge of a receivership, would not permit the receiver to reduce those wages. Taking the case as a whole, we are clearly of opinion that it is our duty to sustain the application for a receiver. As this matter will be pending in this court, the appointment of a receiver and all other appointments will be left entirely with Judge DYER, and I shall have nothing to do with them. I do not intend

to have anything to do| with them, as he is familiar with all the conditions and knows what would be a suitable bond. That is one thing Judge DYER will have to attend to without my assistance.

DYER, District Judge. Concurring in all that Judge TRIEBER has just stated here this morning, nothing remains now for me to do but to appoint a receiver for the defendant company. When matters of this sort are pending in this court, and probably before other judges also, various applications are sometimes made to the court before any action is had for the appointment of a receiver, and names after names are presented to the court by letter or otherwise. I may state that such applications have been made to me, and some persons' names suggested who are members of this order. I do not believe that it is for the best interest of the parties concerned that a member of this order should be appointed receiver thereof, because there may arise a factional fight among the members of the order that would not be well for the order. After concurring in all that Judge TRIEBER has said here this morning, and desiring to do the best I can for the organization, and considering the various parties, I have reached the conclusion that as good a man as I could appoint as such receiver is former United States District Attorney Charles A. Houts. His appointment is now made, and he will be required to give bond in the sum of $50,000, to be approved by the court, and he will take immediate possession of all the assets of the order.